Margaret L. Lockhart, et al. [1] v. Commissioner. Lockhart v. Commissioner
Docket Nos. 54449-54451.
United States Tax Court
T.C. Memo 1957-114; 1957 Tax Ct. Memo LEXIS 132; 16 T.C.M. (CCH) 474; T.C.M. (RIA) 57114; June 28, 1957
*132 Held, the patents here involved were held primarily for sale in the ordinary course of business and consequently the payments received by the taxpayers from the transfer of such patents are taxable as ordinary income. Richard P. Jackson, Esq., 70 Pine Street, New York, N. Y., for the petitioners. William F. Fallon, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in Federal income taxes in these consolidated proceedings, as follows: Dkt.
No.
Petitioner
Year
Deficiency
54449
Margaret L. Lockhart
1946
$ 2,639.92
1947
8,897.06
54450
Estate of Marshall L.
Lockhart, Deceased,
Robert W. Matthies,
Executor
1946
5,944.69
1947
70,861.98
54451
Estate of Marshall L.
Lockhart, Deceased, et
al.
1948
2,775.34
1949
20,637.62
*133 The issue is whether amounts received by the petitioners under the terms of certain patent agreements are taxable as long-term capital gains or as ordinary income. Findings of Fact Marshall L. Lockhart, deceased, and his wife, Margaret L. Lockhart, residents of Rutherford, New Jersey, filed individual Federal income tax returns for the years 1946 and 1947 and they filed joint returns for the years 1948 and 1949. All returns were filed with the then collector of internal revenue at Newark, New Jersey. From 1928 to 1934 Marshall L. Lockhart, hereinafter some times referred to as the decedent, was employed as an engineer by the American Telephone and Telegraph Company in Des Moines, Iowa, during which time he filed, together with a coinventor, a patent application for a switching device known as a selector. The patent was granted in 1936. In 1934 the decedent was on a leave of absence from his employment to develop his idea that heart sounds could be graphically photographed. This device, an electrostethograph, for which a patent application had been filed on February 5, 1934, had no connection with decedent's employment with the American Telephone and Telegraph Company. A patent *134 for this device was granted to decedent in 1937. In June 1934, the decedent demonstrated the electrostethograph at the American Medical Association Convention in Cleveland, Ohio, in order to interest some person or company in the manufacture and sale of the device. The Cambridge Instrument Company became interested in the electrostethograph, and the decedent granted that company a license in August 1934, to manufacture and sell the device on a royalty basis. In August 1934, the decedent joined the Cambridge Instrument Company as a development engineer in order to complete the development of the electrostethograph and get it in a field operating condition. It was originally intended by the Cambridge Instrument Company that the decedent would remain in its employ for a period of six to eight months. Decedent remained with the Cambridge Instrument Company until April 1942, and during this period he personally demonstrated the electrostethograph to possible purchasers. During this period the decedent endeavored to interest the Postal Telegraph Company in the selector device which he had previously patented as coinventor. In 1935, while decedent was employed by the Cambridge Instrument *135 Company, he began to work at home on a device which would give a hypodermic injection without a needle. This device, called Hypospray, was not similar to the line of instruments manufactured by the Cambridge Instrument Company. Some time in 1940 or 1941, while still employed by the Cambridge Instrument Company, the decedent demonstrated his Hypospray device to the Squibb Company, which corporation took an option on the device to explore its possibilities. Squibb Company did not have the facilities to manufacture the device and in 1942 the device was turned over to the Gelatin Products Company in Detroit, Michigan. Decedent joined the staff of the Gelatin Products Company in April 1942 as a consultant and remained there until the end of 1943. While there he worked on the development of the Hypospray device until he was requested to put that work aside in 1943 and work on a substitute for the tin used in the Squibb syrette. Decedent was successful in developing a substitute, called Hyposeal, for the Squibb syrette, using plastic instead of tin. There was no agreement between decedent and the Gelatin Products Company that required decedent to turn over to the corporation any development *136 or research work done by him. During 1943 the decedent, while still employed by the Gelatin Products Company, showed the Hyposeal device to Becton, Dickinson & Company in Rutherford, New Jersey, with a view to the possibilities of the device and the extent of its market. At this time there was litigation pending between the decedent and the Gelatin Products Company as to the ownership of the Hyposeal device, and under a settlement reached by the parties, Gelatin Products Company relinquished all claims to Hyposeal and received from the decedent an exclusive license to manufacture, use and sell the Hypospray device. Under this license agreement, dated August 11, 1944, decedent was to receive royalties on the sale of the Hypospray device, with a minimum annual payment of $10,000. Decedent received $10,000 from Gelatin Products Company under this exclusive license agreement in 1946. Becton, Dickinson & Company expressed an interest in the Hyposeal device, and early in 1944 the decedent became employed by that corporation as a consulting engineer, at a yearly salary of $6,600, with his principal duty being the development of the Hyposeal device. Decedent assigned a one-half interest *137 in the Hyposeal patents (Patent No. 2,408,323 and related patents) to his wife, Margaret, on October 16, 1944. On November 14, 1944, the decedent and his wife granted Becton, Dickinson & Company an "exclusive right to manufacture and sell" the Hyposeal device. This agreement read, in part, as follows: "You [Marshall and Margaret Lockhart] are to grant us the exclusive right to manufacture and sell these devices and parts thereof, and to license others to do likewise during the life of the patent or future patents that issue and are based on said applications. This license shall extend throughout the world. "In consideration of the granting to us of these exclusive rights, we are to pay you a royalty of five per cent (5%) of our net wholesale price on sales of these devices and their various parts by ourselves and our licensees. * * *" Becton, Dickinson & Company paid the following royalties on the Hyposeal devices to decedent and his wife up to the end of 1953: 1946
$23,036.45
1947
80,179.07
1948
31,546.59
1949
90,286.57
1950
68,728.31
1951
99,250.49
1952
40,724.34
1953
3,393.33
In 1946 the decedent assigned to Becton, Dickinson & Company for *138 $8,500, his entire right, title and interest in a device patented by him (Patent No. 2,467.678) under the name Twinpak. On June 9, 1947, the decedent assigned his rights in the Hypospray devices, subject to the exclusive license previously granted by decedent to the Gelatin Products Company, to Becton, Dickinson & Company for $135,000, plus 50 per cent of the royalties payable to Becton, Dickson & Company by Gelatin after Becton, Dickinson & Company had received $135,000. Decedent completed his work on Hyposeal for Becton, Dickinson & Company in December 1947 and left the employ of that company at that time. During the years 1936 through 1955 approximately 37 patents were granted to the decedent. Some of these patents represented refinements of basic inventions. At least 15 of the patents issued to the decedent were for basic devices, as follows: Year
Patent
Granted
No.
Nature of Invention
1936
2,039,966
Selector for telegraph circuits
1937
2,099,938
Electrostethograph
1942
2,298,574
Camera structure
1943
2,322,244
Hypospray
1944
2,343,195
Starting mechanism for in-
ternal combustion engines
1946
2,408,323
Hyposeal
1949
2,467,678
Receptacle (Twin-pak)
1951
2,576,951
Plural-compartment hypoder-
mic syringe
1951
2,577,780
Crowned cupped resilient
plug
1952
2,610,628
Plural-compartment admixing
vial
1954
2,688,325
Piston plug for hypodermic
syringe devices
1954
2,693,183
Blood Telltale
1955
2,722,257
Sampling tube equipment
1955
2,724,385
Ointment depositors
1955
2,725,683
Method of blowing hollow
glass vials
*139 Marshall L. Lockhart, decedent, held the patents involved here for sale or license in the ordinary course of business as a professional inventor. Opinion Marshall L. Lockhart and wife, Margaret, transferred their rights in three basic patents, Hyposeal, Hypospray, and Twinpak, and during the years 1946 to 1949, inclusive, received royalty payments which are the basis of the present controversy. Respondent takes the position that these payments are taxable as ordinary income since the nature of Marshall's activities demonstrates that he was a professional inventor and that his inventions were held by him primarily for sale or licensing to customers in the ordinary course of business. Petitioners regarded these patents as capital assets which were not stock in trade or property held primarily for sale to customers in the ordinary course of business and treated the gains realized from the transfers of such patents as capital gains. Sections 117(a) and 117(j) of the 1939 Internal Revenue Code. We have examined the record carefully and have found that Marshall held the basic patents here involved primarily for sale to customers in the ordinary course of his business. Such a determination *140 depends on the facts in each case. Higgins v. Commissioner, 312 U.S. 212. Marshall's sustained activities in developing and pushing the acceptance of his various patents convinces us that this was a business enterprise. We are persuaded that this was Marshall's intent. From 1934, when he left the employ of the American Telephone and Telegraph Company to develop an idea, later patented, that heart sounds could be graphically photographed, to the years involved here, he followed quite a definite pattern of developing ideas, generally in the medical field, interesting some manufacturer in the idea, joining the staff of such manufacturer to develop that idea, and granting to the manufacturer exclusive licenses to the patents arising from such ideas. There was nothing sporadic about this activity. Usually, while Marshall was perfecting one device with a manufacturer, he was already venturing out on other devices and seeking to interest still other manufacturers in the new devices. Nor were there, as a rule, any agreements between Marshall and the various manufacturers who employed him to develop his inventions, that any new inventions developed while in a manufacturer's employ *141 would belong to that manufacturer. Marshall's salary, it should also be noted, was always separate and apart from any royalty payments received under the exclusive license agreements entered into for the various inventions. Over a period of years, from 1936 through 1955, approximately 37 patents were granted to Marshall, and while some of these are refinements of basic patents, we have found that at least 15 of such patents were for basic inventions. It is certain to us, from an examination of these facts, that Marshall was in the business of selling and licensing his inventions, and that, consequently, the payments received by him and his wife, Margaret, during the years 1946 through 1949, from the transfer of the three basic inventions, are taxable as ordinary income. In Harold T. Avery, 47 B.T.A. 538, the taxpayer had received about 12 patents over a period of 17 years. One of these inventions led to his employment by a corporation, which later purchased such invention. Taxpayer sold two more patents, one to his employer, and another to an outside corporation. He also licensed two patents to two outside corporations. In short, he disposed of five patents or rights *142 therein, or about half of the patents secured by him. We held that the taxpayer was in the business of inventing, selling and licensing the patents obtained by him: "The primary use to petitioner of the appliances and devices developed by his creative genius and the patents issued thereon was the gain to be derived from the sale or other disposition of the patents to persons or corporations to whom they were of beneficial use. What may have been a hobby originally became a trade or business when he held the patents for sale or license to others for profit. We think it is immaterial that he created no new devices or received no new patents in the year he sold the patent to the Marchant Co. Until disposed of his patents were held primarily for sale or other disposition to customers and this situation was not different during the taxable year. He not only hoped to but did realize gains or profits from his activity as an inventor and the sale or licensing of patents on devices invented by him. "While the petitioner may not have been particularly active in trying to make money out of his patents, as testified by him, his testimony discloses that he endeavored to keep acquainted with *143 the persons who were working along lines similar to his own and informed them what he was doing since out of such acquaintances 'sometimes something develops.' In any event his activity in this regard was not only sufficiently effective to obtain purchasers or licensees for five of his twelve patents but also led to his employment by the Marchant Co. Under the circumstances any person thus found who bought petitioner's patents or acquired rights therein is a customer, as that term is ordinarily understood." Charles H. Black, Sr., 45 B.T.A. 204, 210. We think the Avery case is applicable here. Respondent's determination is sustained. Decisions will be entered for the respondent. Footnotes
1. The following proceedings are consolidated herewith: ESTATE OF MARSHALL L. LOCKHART, DECEASED, ROBERT W. MATTHIES, EXECUTOR, Docket No. 54450; and ESTATE OF MARSHALL L. LOCKHART, DECEASED, ROBERT W. MATTHIES, EXECUTOR, and MARGARET L. LOCKHART, Docket No. 54451.↩